UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PUBLIC OFFERING<br>PLE ANTITRUST LITIGATION | )<br>)<br>)<br>)<br>) |
| STUART CABLE, | )<br>)<br>) |
| Petitioner, | ) CIVIL ACTION<br>) NO. 05-10747-WGY |
| v. | )<br>) |
| JEFFREY A. WEINMAN,<br>TRUSTEE FOR WESTERN PACIFIC<br>AIRLINES, and EQUALNET<br>COMMUNICATIONS CORPORATION, | )<br>)<br>)<br>)<br>) |
| Respondents. | )<br>) |

MEMORANDUM

YOUNG, D.J.                                       January 31, 2006

## I.   **INTRODUCTION**

This matter arises from a subpoena served upon attorney
Stuart Cable ("Cable") seeking information related to public
statements he made in an IPO Journal article.  The information
was sought by the plaintiffs in an antitrust action ("the
antitrust plaintiffs") pending in the Southern District of New
York.  Cable moved to quash the subpoena, arguing, inter alia,
that it sought his testimony as an unretained expert.  Following
this Court's allowance of Cable's motion, the antitrust

plaintiffs appealed to the First Circuit Court of Appeals. In its ruling of October 20, 2005, [Doc. No. 24], the First Circuit vacated this Court's decision and remanded the matter for consideration of five specific questions.

After considering the issues raised by the First Circuit, this Court held an evidentiary hearing on December 16, 2005 and permitted Cable to be questioned regarding the factual bases for certain of his public statements. Thereafter, the Court allowed Cable's motion to quash, as the information sought by the antitrust plaintiffs had now been obtained and because Cable's further cooperation would be unduly burdensome. This memorandum explains the Court's ruling and addresses the issues highlighted for consideration by the First Circuit.

## A.   Factual and Procedural Background

This matter "is ancillary to an antitrust action brought in the Southern District of New York by two formerly publicly traded companies against some twenty-eight investment banks alleging a conspiracy to fix fees for underwriting services related to initial public offerings of stock (IPOs)." Weinman v. Cable, 427 F.3d 49, 50 (1st Cir. 2005). Specifically, the antitrust action is based upon the allegation that in the years 1995 through 1997, 95% of IPOs valued "between $20 million and $80 million carried fixed and non-negotiable underwriting fees of 7%." Pls.' Mem. in

2

Opp'n to Stuart Cable's Mot. to Quash Pls.' Subpoena ("Pls.'
Second Quash Opp'n Mem.") [Doc. No. 11] at 2 (citation omitted).
The First Circuit has been "informed that class certification
papers are soon to be submitted" in the antitrust action.
Weinman, 427 F.3d at 50 n.1.

This Court's involvement in the case stems from discovery
sought from Cable, a non-party.  Cable is an attorney in the
Boston office of Goodwin Procter LLP.  Cable's Opp'n to Pls.'
Objection to Order Granting Mot. to Quash ("Cable's Obj. Opp'n")
[Doc. No. 8] at 1.  Cable specializes in corporate and securities
law and has approximately twenty-five years of experience.  Id.
In November 2001, Cable wrote an article entitled "Top Ten To-
Do's for CEOs of the Next New Thing" featured in IPO Journal.[1]
Id. at 2; Cable's Mem. in Supp. of Mot. to Quash Pls.' Second
Subpoena ("Cable's Second Quash Mem.") [Doc. No. 10], Ex. B,
Subpoena of 3/29/05 ("3/29/05 Subpoena"), Ex. C, Stuart Cable,
"Top Ten To-Do's for CEOs of the Next New Thing," IPO Journal,
Nov. 2001, at 11-13 ("Cable Article").

The article began by noting that "Cable's specific
transactional experience includes initial and other public
offering transactions, representing both issuers and underwriters
. . . ."  Cable Article at 11.  Cable stated further that his IPO

---

[1]Although the article appeared in the form of an interview,
Cable indicated that the item was an "article written by" him.
Cable's Obj. Opp'n at 2.

3

experience included representing nine companies (mentioned by name) in connection with their IPOs as well as three specific investment bank underwriters. Id. The portion of the article most relevant to the matter before the Court is Cable's response to the following query: "What advice do you think the CEO of a 1998 Internet IPO that subsequently failed would have for the CEO of a company now planning to go public in the hoped-for turnaround in the IPO market?" Id. Cable responded by listing "top ten tips [he] believe[d] the veteran of going public would give the recruit as he or she left for IPO boot camp." Id.

Cable's first tip titled, "Selecting the Investment Bankers" stated,

Subject to size and your ability to attract a high-end lead underwriter, it is preferable to have more banks on your cover than fewer (optimally four, three for smaller deals, and two for the smallest deals). You pay a fixed price (7% of gross) and coverage by three analysts is generally preferable to coverage by two.

Id. (emphasis added). Cable's second tip was titled "Cutting the Economic Deal Among Your Bankers." Id. at 12. On this topic, Cable noted, "The deal between you and your bankers is non-negotiable (7% of the gross)." Id. (emphasis added). Cable's eighth tip -- "Pricing Your Deal" -- stated,

The IPO process was designed by underwriters for underwriters. You will not have a meaningful opportunity to negotiate so do not delude yourself on this front. The managing underwriter (without dissent from his co-managers) will present you with the results of their order book - a fait accompli as to pricing with perhaps a modest decision as to sizing.

4

Id. (emphasis added, second alteration in original). Cable's
ninth tip stated in part, "Don't even ask what is in the
underwriting agreement. You won't understand it, and even if you
can . . . it is, for all practical purposes, non-negotiable."
Id. (emphasis added).

On February 25, 2005, the antitrust plaintiffs served a
subpoena on Cable seeking his deposition testimony. Weinman, 427
F.3d at 50. Additionally, the subpoena sought "non-privileged
documents that form the basis for your assertions in the IPO
Journal that an issuer of common stock pays a non-negotiable,
fixed price of seven percent of gross." Id. (internal quotation
marks omitted). "The subpoena also called for documents relating
to a subsequent article in another publication, not at issue
here, and documents relating to any testimony or interviews he
may have given, as well as articles or lectures by him concerning
the pricing of underwriting fees." Id. On March 14, 2005, Cable
moved to quash the subpoena [Doc. No. 1].

Cable "averr[ed] by affidavit that he had not been involved
in any of [the plaintiffs'] IPOs, that his views in the articles
cited had been shaped by this twenty-five years of dealing with
IPOs, and that identifying any pertinent documents would require
him to canvass the files of these years and perhaps to consult
with clients." Weinman, 427 F.3d at 50. Cable observed that
Federal Rule of Civil Procedure 45(c)(3)(B)(ii), permits a

district court to quash or a modify subpoena "requir[ing] disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party . . . ." See Cable's Mem. in Supp. of Mot. to Quash Pls.' Subpoena ("Cable's Quash Mem.") [Doc. No. 2] at 3 (quoting Fed. R. Civ. P. 45(c)(3)(B)(ii)). Cable claimed that the antitrust plaintiffs were inappropriately using a subpoena to secure his expertise. See id. at 4.

According to the antitrust plaintiffs, Cable's suggestion that they desired his expert opinion was "[n]onsense", as they merely sought "the factual underpinnings for [his] factual assertion that IPO underwriting fees are 'fixed' and 'non-negotiable.'" Pls.' Mem. in Opp'n to Cable's Mot. to Quash ("Pls.' First Quash Opp'n Mem.") [Doc. No. 3] at 3 (emphasis added). On March 17, 2005, Magistrate Judge Dein held a telephone conference with counsel to hear argument on the motion to quash. Order of 3/17/05 [Doc. No. 5] at 1. In an order issued the same day, Magistrate Judge Dein observed that the antitrust plaintiffs had produced no evidence that Cable "was in any way involved with, or has any factual information about, the transactions at issue in this litigation." Id. "The most plaintiffs have to offer", she noted, "is the argument that it is statistically likely, given the breadth of . . . Cable's

6

experience . . . that [he] has some non-privileged factual information."  Id.

Accordingly, Cable's motion to quash was allowed without prejudice.  Id. at 2.  As the First Circuit noted, Magistrate Judge Dein "rested her conclusion on her perception that [plaintiffs] were seeking an unretained expert's opinion, contrary to the safeguards of [Rule] 45(c)(3)(B)(ii)."  Weinman, 427 F.3d at 51; Order of 3/17/05 at 1.  The antitrust plaintiffs filed an objection to Magistrate Judge Dein's order and moved this Court for reconsideration.  Pls.' Objection to Magistrate Judge's Order on Mot. to Quash ("Pls.' Obj.") [Doc. No. 6] at 1. First, the antitrust plaintiffs argued, Magistrate Judge Dein erroneously required them to show that "Cable had relevant testimony."  Pls.' Obj. at 4.  Citing Federal Rule of Civil Procedure 26(b)(1), the plaintiffs argued that they were only required to show that "[Cable's] deposition was 'reasonably calculated to lead to the discovery of admissible evidence.'" Id.

Second, the antitrust plaintiffs argued, even if the legal standard applied by Magistrate Dein was correct, it had been met. Id.  They pointed out that Cable had "publicly declared his knowledge of facts essential to the claims, and it was these facts, not [his] expertise, that plaintiffs pursue."  Id. at 4-5. The antitrust plaintiffs observed further that Cable's argument

7

that he was not involved in their particular IPOs was a "red
herring." Id. at 7. That is, they suggested, any evidence Cable
provided regarding any of the defendants' participation in a
broad price-fixing conspiracy would be relevant to their case
even if a class was not ultimately certified. See id.
Additionally, the antitrust plaintiffs noted that Cable had
represented at least two underwriters alleged to have
participated in the price-fixing scheme and six issuers in IPOs
within the monetary range specified in the Complaint. See id. at
5.

     Prior to a ruling on their motion for reconsideration, the
antitrust plaintiffs served Cable with a second subpoena. See
3/29/05 Subpoena. The new subpoena related only to the IPO
Journal article and requested Cable's deposition testimony and

     [a]ll non-privileged documents or communications considered
     by you in making the factual assertions in the IPO Journal,
     Vol. 4, No. 11, November 2001, pages 11-13 (Attached as
     **Exhibit C**) that an issuer of common stock pays a "fixed
     price (7% of gross)" for underwriting fees and that "the
     deal between [the issuer] and the banker is non-negotiable
     (7% of gross)."

Id. (alteration in original).

     Cable moved to quash arguing that (1) the subpoena sought
his testimony as an unretained expert and (2) compliance would be
unduly burdensome. Cable's Second Quash Mem. at 4-6. By
affidavit, Cable averred that he could "not recall considering
any documents in connection with" his statements in the IPO

8

Journal article and that he possessed "no files associated with
[the article] . . . ." Cable's Second Quash Mem. Attach. 1 at
15, Aff. of Stuart Cable in Supp. of Objection Pursuant to Fed.
R. Civ. P. 45(c)(2)(B) to Pls.' Second Subpoena ("Cable Aff.") ¶
4. Rather, Cable claimed, he "made those statements based on
[his] experience as a lawyer with approximately 25 years of
practice in the corporate and securities field." Id. ¶ 5.

In their opposition to Cable's motion to quash, the
antitrust plaintiffs maintained that "[t]he determinative feature
of this dispute is that [Cable] has knowledge of facts central to
the antitrust conspiracy that lies at the heart of plaintiffs'
action whether [such action was] brought individually, or on a
class-wide basis." Pls.' Second Quash Opp'n Mem. at 2 (emphasis
added). The antitrust plaintiffs noted that six of the
transactions identified by Cable in his IPO Journal article "fall
within the price-fixed profile of the complaint."[2] Id. at 3
(citation omitted). Additionally, the antitrust plaintiffs
pointed out for the first time that in seven of the IPOs
identified by Cable in which he had represented issuers, a named

_____

[2]That is, Cable "represented six issuers between 1995 and
1997 in IPOs within the range specified in the complaint ($20
million to $80 million), where the underwriting fee was seven
percent." Weinman, 427 F.3d at 51.

9

defendant in the antitrust litigation had been the underwriter.[3]
Id.

Thus, the antitrust plaintiffs maintained, it was clear that
Cable had been involved in transactions at issue in this
litigation. Id. It was therefore "reasonably likely", the
antitrust plaintiffs argued, that Cable observed instances in
which "the fixed fees complained of have been imposed [by the
underwriter defendants], and that these observations contributed
to his voluntary public remarks that fees are 'fixed' at 7% and
are 'non-negotiable.'" Id.

This Court allowed Cable's motion to quash on May 3, 2005.
On October 20, 2005, the First Circuit vacated this Court's
ruling. Weinman, 427 F.3d at 53. According to the First
Circuit, despite the deference accorded to a district court's
discovery rulings, "the existence of unanswered questions
presented by the record makes us reluctant to affirm without the
benefit of the district court's informed and particularized
assessment." Id. at 52. The First Circuit went on to highlight

---

[3]This information was not presented to Magistrate Judge
Dein, which likely accounts for her conclusion that the antitrust
plaintiffs possessed no evidence that Cable "was in any way
involved with, or has any factual information about, the
transactions at issue in this litigation." Order of 3/17/05 at
1. This conclusion was the basis for her determination that the
information sought from Cable through the first subpoena was
protected by Rule 45(c)(3)(B)(ii). See id.

10

five issues for this Court to consider on remand in addressing Cable's motion to quash. Id. at 52-53.

First, the court noted, there existed the issue of whether the plaintiffs sought unretained expert testimony or merely the factual basis for Cable's IPO Journal statements. Id. at 52. Second, this Court was to consider "the threshold of relevance to which the evidence sought should rise. Need it be reasonably calculated to lead to evidence directly connected with the transactions involving the [plaintiffs], or is it enough if it is likely to lead to proof of a general conspiracy that inevitably would impact [plaintiffs' IPOs]?" Id.

Third, "even if what is sought is factual and, if admissible, relevant, how likely is it that Cable's testimony could survive claims of privilege?" Id. Fourth, the court observed, because "data already exists of the widespread prevalence of parallel pricing, another question that must be addressed is whether inquiries into these scenarios would be calculated to produce non-cumulative evidence pointing to a traditional conspiracy." Id. Fifth, the First Circuit noted, there exists the question of "whether [plaintiffs'] discovery requests pose such an 'undue burden' on . . . Cable that, under Rules 26(c) and 45(c)(3)(a)(iv), quashing the subpoena is warranted even though relevant materials or testimony is sought." Id. at 53.

11

On November 3, 2005, this Court scheduled a hearing on Cable's Motion to Quash for December 14, 2005.  On November 22, 2005, the antitrust plaintiffs requested that this Court reschedule the proceeding as an evidentiary hearing "for the purpose of permitting their counsel to question Mr. Cable on the matters highlighted by the First Circuit's opinion . . . ."  Pls.' Mot. for Evid. H'rg [Doc. No. 26] at 1.  On November 20, 2005, this Court issued an electronic order rescheduling the December 14 hearing as an evidentiary hearing to be held on December 16, 2005.

At the December 16, 2005 hearing, this Court permitted Cable to be questioned regarding the non-privileged factual bases for certain of his IPO Journal statements.  This Court allowed such questioning after concluding that: (1) the testimony sought was not expert in nature; (2) the information was sufficiently relevant to the antitrust plaintiffs' claims; (3) there was a reasonable likelihood that the information sought could survive claims of privilege; and (4) requiring Cable to testify was not unduly burdensome.  The Court explains these conclusions below.

## II.  DISCUSSION

### A.  Rule 45(c)(3)(B)(ii)

Under the First Circuit's ruling, this Court was first to consider whether the antitrust plaintiffs sought Cable's

12

testimony as an unretained expert or simply the factual bases for

his IPO Journal statements. Under Federal Rule of Civil

Procedure 45(c)(3)(B)(ii), a district court is permitted -- but

not required -- to quash or modify a subpoena if it "requires

disclosure of an unretained expert's opinion or information not

describing specific events or occurrences in dispute and

resulting from the expert's study not made at the request of any

party" to the litigation. As the Advisory Committee notes on the

1991 amendment to Rule 45 illuminate, Rule 45(c)(3)(B)(ii) was

designed to "provide[] appropriate protection for the

intellectual property of the non-party witness . . . ." Fed. R.

Civ. P. 45(c)(3)(B)(ii) advisory committee's note.

According to the Advisory Committee, compelling experts to

testify unfairly denies them "the opportunity to bargain for the

value of their services." See id. Thus, Rule 45(c)(3)(B)(ii)

"establishes the right of such persons to withhold their

expertise . . . ." Id. A "district court's discretion" in

determining whether to quash or modify a subpoena under this rule

"should be informed by", among other factors, "'the degree to

which the expert is being called because of his knowledge of

facts relevant to the case rather than in order to give opinion

testimony . . . .'" Id. (quoting Kaufman v. Edelstein, 539 F.2d

811, 822 (2d Cir. 1976)) (emphasis added).

13

The antitrust plaintiffs maintained that it was not Cable's
opinion or expertise they were interested in, but "the factual
underpinnings for [his] factual assertion that IPO underwriting
fees are 'fixed' and 'non-negotiable.'" Pls.' Second Quash Opp'n
Mem. at 8. Apparently conceding that the antitrust plaintiffs
sought not his opinion, Cable countered that they
"misapprehend[ed] the distinction drawn by Rule 45(c)(3)(B)(ii)."
Cable's Obj. Opp'n at 4. That is, Cable contended, "[t]he rule
applies to protect a prospective witness whose testimony <u>derives
from</u> his or her expertise, unless the party seeking discovery
seeks 'information . . . describing specific events or
occurrences in dispute' . . . ." <u>Id.</u> (quoting Fed. R. Civ. P.
45(c)(3)(B)(ii)) (emphasis added, second alteration in original).

According to Cable, because it is undisputed that he had no
involvement with the antitrust plaintiffs' IPOs, "[u]nless and
until a class is certified <u>and</u> the class is defined to include
[his] former IPO clients . . . there is no plausible argument"
that he has information describing events or occurrences in
dispute in the antitrust litigation. <u>Id.</u> at 4 (alteration in
original). Rather, Cable maintained, "[a]ll that he has are the
general impressions formed and conclusions reached as a result of
extensive experience in representing clients in IPOs." <u>Id.</u> Such
information, Cable argued, constitutes exactly the type of
testimony for which experts are obtained. <u>Id.</u> This argument,

14

however, mischaracterized both the scope of the antitrust litigation and the nature of the information sought from Cable.

In the underlying litigation, the antitrust plaintiffs allege that the underwriter defendants "conspired to fix the underwriting fees of all IPOs between the range of approximately $20 million and $80 million at 7%." Pls.' Second Quash Opp'n Mem. at 5 (alteration in original). Through an examination of Cable, the antitrust plaintiffs sought to ascertain whether he observed the imposition of 7% fees by any of the defendants in connection with IPOs "fitting this case's conspiracy profile . . . ." Id. at 3. Thus, the antitrust plaintiffs desired not Cable's "general impressions" based upon his expertise, but his eye-witness testimony regarding what, if anything, the underwriter defendants did to contribute to his unqualified factual assertion that underwriting fees are "non-negotiable" and "fixed at 7%." If Cable had observed such conduct, whether he is an IPO expert or someone with no prior experience in that field is of no moment to the antitrust plaintiffs.

As the antitrust plaintiffs correctly point out, identical behavior among businesses regarding pricing is probative of a price-fixing conspiracy between them. See Pls.' Obj. at 6 n.6; In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 655 (7th Cir. 2002) (explaining that an agreement between businesses to fix prices can be inferred from "economic evidence

15

suggesting that the defendants were not in fact competing"); In re Citric Acid Litig. 7-Up Bottling Co. of Jasper Inc., 191 F.3d 1090, 1102 (9th Cir. 1999) ("Parallel pricing is a relevant factor to be considered along with the evidence as a whole; if there are sufficient other 'plus' factors, an inference of conspiracy can be reasonable.").

Cable's IPO Journal article stated of initial public offerings that "[t]he deal between you and your bankers is non-negotiable (7% of the gross)." Cable Article at 12 (emphasis added). Given that the article highlighted Cable's representation of issuers in seven initial public offerings in which a defendant in the antitrust litigation was the underwriter, Pls.' Second Quash Opp'n Mem. at 4, it is difficult to fathom how Cable could argue that he lacked information "describing specific events or occurrences in dispute." Cable's Obj. Opp'n at 4 (quoting Fed. R. Civ. P. 45(c)(3)(B)(ii)). That is, central to the antitrust plaintiffs' claims is that the defendants fixed underwriting fees at 7% in every IPO falling within the same economic range. Pls.' Second Quash Opp'n Mem. at 5; In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig., 2004 U.S. Dist. LEXIS 3892, at *4 (S.D.N.Y. Mar. 12, 2004) (noting that plaintiffs' allege that since at least 1994, defendants "combined and conspired to raise, fix and maintain,

16

and did raise, fix and maintain" underwriting fees in connection with IPOs valued between $20 million and $80 million).

Cable's article suggests that he has factual knowledge that defendants in the antitrust litigation fixed their underwriting fees at 7% for IPOs in the same economic range as thoses of the antitrust plaintiffs.[4] Whether the defendants' fees were so fixed is a key dispute in the antitrust litigation.[5] As the antitrust plaintiffs accurately observed, Cable's potential testimony regarding the underwriter defendants' pricing practices is as relevant to this case as it is to a potential class action involving the issuers of similar IPOs whom Cable actually

_____

[4]Thus, contrary to Cable's assertion, the antitrust plaintiffs did not seek information they could obtain from "any one of thousands of lawyers" familiar with "the standards and practices" of the IPO industry. Cable's Quash Mem. at 3-4. As the antitrust plaintiffs noted, Cable, "not thousands of other professionals, stated publicly, voluntarily and in a broadly published journal that he has knowledge of a pivotal fact, one that would indicate a price-fixing conspiracy." Pls.' First Quash Opp'n Mem. at 3.

[5]See Cable v. In re Public Offering PLE Antitrust Litig., No. 05-MBD-10018-WGY, Tr. of Mot. H'rg of 3/17/05 ("Tr. of Hr'g of 3/17/05") [Doc. No. 9] at 8 (transcribing exchange between Magistrate Judge Dein and counsel for antitrust plaintiffs in which counsel noted that whether underwriting fees are fixed and non-negotiable is disputed in the underlying litigation).

represented.[6]  See Pls.' Second Quash Opp'n Mem. at 5, 7-8; see also infra Part B.

Because the antitrust plaintiffs sought factual information from Cable "describing specific events [and] occurrences in dispute" in the antitrust litigation, such information is not shielded by Rule 45(c)(3)(B)(ii).  Statutory Comm. of Unsecured Creditors v. Motorola, Inc., 218 F.R.D. 325, 327 (D.D.C. 2003) (noting that under Rule 45(c)(3)(B)(ii) "[w]hen . . . a party seeks only factual information relating to an issue in the case, a witness cannot demand any greater compensation than any other witness merely because he or she can claim some expertise in a discipline or calling."); Arkwright Mut. Ins. v. National Union Fire Ins. Co., 148 F.R.D. 552, 557 (S.D. W. Va. 1993) ("Discovery of . . . purely factual information does not comprise the 'intellectual property' of [a witness] and is therefore not protected by Rule 45(c)(3)(B)(ii).").

Because the antitrust plaintiffs sought factual information describing events in dispute in the antitrust litigation, it was unnecessary for this Court to determine whether the information sought from Cable fulfilled the final requirement for protection

---

[6]That is, such testimony would (1) tend to demonstrate that fees were, in fact, fixed at 7% and (2) be probative of a general price-fixing conspiracy. In re Citric Acid Litig., 191 F.3d at 1102 ("Parallel pricing is a relevant factor to be considered along with the evidence as a whole; if there are sufficient other 'plus' factors, an inference of conspiracy can be reasonable.").

18

under Rule 45(c)(3)(B)(ii): that it "result[] from the expert's study made not at the request of any party . . . ." Fed. R. Civ. P. 45(c)(3)(B)(ii) (emphasis added). It does not appear, however, that questions regarding events Cable witnessed, seek information resulting from his "study" as an expert. See id.

## B. Relevance Threshold

The second matter this Court considered was "the threshold of relevance to which the evidence sought should rise." Weinman, 427 F.3d at 52. That is, "[n]eed it be reasonably calculated to lead to evidence directly connected with the transactions involving the [plaintiffs], or is it enough if it is likely to lead to proof of a general conspiracy that inevitably would impact [the antitrust plaintiffs' IPOs]?" Id. As the discussion above foretells, it was sufficient that the evidence sought from Cable would be probative of a price-fixing conspiracy among the defendants. Whether the evidence was "directly connected" to the antitrust plaintiffs' particular IPOs did not affect its relevance to the case.

Federal Rule of Civil Procedure 26(b)(1) provides that

[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

19

(emphasis added).  Relevant evidence is defined in Federal Rule
of Evidence 401 as "evidence having any tendency to make the
existence of any fact that is of consequence to the determination
of the action more probable or less probable than it would be
without the evidence."  (emphasis added).

As discussed above, the antitrust plaintiffs allege that the
fees for their respective IPOs where set pursuant to a conspiracy
to fix the underwriting fees for all IPOs in the same economic
range.  Pls.' Second Quash Opp'n Mem. at 5; In re Issuer
Plaintiff Initial Pub. Offering Antitrust Litig., 2004 U.S. Dist.
LEXIS 3892, at *4.  Any evidence Cable might provide tending to
prove the existence of such a price-fixing conspiracy[7] would meet
the standard of Rule 26(b)(1) discoverability because it is
directly relevant to the "subject matter involved in" the
antitrust action.  That is, it tends to make the existence of
facts that are of consequence to the antitrust action more
probable, namely: (1) that the alleged conspiracy actually
existed and (2) that the fees paid by plaintiffs were fixed
pursuant to it.  Fed. R. Evid. 401.

_____

[7]As discussed above, evidence that the defendants insisted
on a non-negotiable 7% underwriting fee would be probative of a
price-fixing conspiracy among them.  See In re Citric Acid
Litig., 191 F.3d at 1102 ("Parallel pricing is a relevant factor
to be considered along with the evidence as a whole; if there are
sufficient other 'plus' factors, an inference of conspiracy can
be reasonable.").

## C.    Privilege Issues

The third issue highlighted by the First Circuit for consideration was the likelihood that Cable's testimony could survive claims of privilege. Weinman, 427 F.3d at 52. In moving to quash the original subpoena, Cable argued that the information sought would be "protected by the attorney-client privilege in most instances." Cable's Quash Mem. at 6 (citation omitted). As the First Circuit observed, the attorney-client privilege presumably would prohibit Cable from breaching confidences "entrusted to him by either issuer or underwriter clients."[8] Weinman, 427 F.3d at 52.

The First Circuit noted, however, that the antitrust plaintiffs had highlighted two situations in which Cable's duties of confidentiality would not be triggered. Weinman, 427 F.3d at 52. First, Cable could "testify to representations or communications of a third party in the course of representing either an issuer or an underwriter" without running afoul of the attorney-client privilege. Id. Second, "had Cable been

---

[8]Cable's IPO Journal article discloses that "[o]n the underwriter side, the investment banks I am frequently asked to represent in IPOs include Salomon Smith Barney", one of the defendants in the antitrust litigation. Cable Article at 11; In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig., 2004 U.S. Dist. LEXIS 3892, at *4 n.2. Moreover, the antitrust plaintiffs indicate that Cable has represented at least two of the underwriter defendants. Pls.' Obj. at 5.

instructed [by a client] to tell something to a third party, the privilege would not survive." Id.

Because Cable conceivably could provide relevant information without violating his ethical obligations, this Court concluded, the chance that some of the testimony sought may be privileged did not justify quashing the subpoena as a prophylactic measure. As the antitrust plaintiffs observed, Cable "retain[ed] full entitlement to claim privilege where appropriate."[9]  Pls.' First Quash Opp'n Mem. at 4.  Accordingly, this Court rejected Cable's privilege-based argument as a reason to prevent the antitrust plaintiffs from questioning him.

## D.   Likelihood that Examination of Cable will Result in Non-Cumulative Evidence

According to the First Circuit, because "data already exists of the widespread prevalence of parallel pricing, another question that must be addressed is whether" Cable's testimony "would be calculated to produce non-cumulative evidence pointing to a traditional conspiracy."  Weinman, 427 F.3d at 52.  This apparently was a directive to apply Federal Rule of Civil Procedure 26(b)(2)(i), which states that discovery may be limited

_____

[9]Cable himself acknowledged that whether his confidentiality obligations are triggered, "of course, would depend on the questions posed, i.e. whether the question seeks the disclosure of a communications between Mr. Cable and his client."  Cable's Mot. for Reconsid. [Doc. No. 27] at 2.

to the extent it "is unreasonably cumulative or duplicative
. . . ." As Cable pointed out, this inquiry is "mainly a
function of the other evidence" in the antitrust litigation.
Cable's Mot. for Reconsid. at 3.

The evidence amassed in the antitrust litigation, however,
was not before this Court. The antitrust plaintiffs had only
indicated that they possessed "undisputed academic testimony and
statistics that" for the time period at issue, 95% of IPOs
"between $20 million and $80 million carried fixed and non-
negotiable underwriting fees of 7%." Tr. of Hr'g of 3/17/05 at
19; Pls.' Second Quash Opp'n Mem. at 2. Although unable to
undertake a qualitative and quantitative analysis of the evidence
assembled by the antitrust plaintiffs, this Court permitted Cable
to be questioned. Such result followed from this Court's
conclusion that Cable's testimony was non-expert in nature,
relevant, and capable of being taken in a short period of time.

**E.   Undue Burden Analysis**

The final issue targeted by the First Circuit for
consideration was whether the requested discovery posed "such an
'undue burden' on . . . Cable that, under Rules 26(c)[10] and

---

[10]"Upon motion by . . . the person from whom discovery is
sought . . . the court in the district where the deposition is to
be taken may make any order which justice requires to protect a
party or person from . . . undue burden . . . including . . .
that the disclosure or discovery not be had . . . ." Fed. R.

45(c)(3)(a)(iv)[11], quashing the subpoena [was] warranted even though relevant materials or testimony [was] sought." Weinman, 427 F.3d at 53. The First Circuit noted that although the subpoena requested documents considered by Cable, the plaintiffs had since "reduced [their] request" and currently sought only Cable's testimony. Weinman, 427 F.3d at 53. Thus, the only issue this Court needed to consider was whether requiring Cable to answer the antitrust plaintiffs' questions imposed an undue burden upon him.

Although a single question had yet to be posed to him, Cable claimed that the antitrust plaintiffs sought his "testimony related to every IPO on which he has ever worked over the past quarter century . . . ." Cable's Second Quash Mem. at 5. The antitrust plaintiffs, however, suggested that they merely sought testimony regarding whether he "ha[d] borne witness to transactional instances fitting this case's conspiracy profile[12] where the fixed fees complained of have been imposed" by the

_____

Civ. P. 26(c)(1).

[11]"On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it . . . . subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iv).

[12]That is, IPOs in the relevant time period valued between $20 million and $80 million and carrying a non-negotiable underwriting fee of 7%. In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig., 2004 U.S. Dist. LEXIS 3892, at *4; Pls.' Second Quash Opp'n Mem. at 2.

underwriter defendants. Pls.' Second Quash Opp'n Mem. at 3 (emphasis added).

According to Cable, "attempt[ing] to recall the specific incidents that have informed his judgment" would be unduly burdensome. Cable's Second Quash Mem. at 5. Additionally, Cable claimed that, if forced to testify, he would face "the difficult task of sorting through whether or not he would be violating his obligation to protect privileged and confidential information . . . ." Id. Cable argued that it was unreasonable to impose such an obligation on him and his law firm, which shares his ethical responsibility. Id.

The First Circuit observed that despite the antitrust plaintiffs' reduced discovery request, "the evaluation of benefit to [plaintiffs] versus burden on [Cable] is a demanding and sensitive one." Weinman, 427 F.3d at 53. The fact that Cable is a non-party, the court noted, "is entitled to special weight in evaluating the balance of competing needs." Id. (citing Cusumano v. Microsoft Corp., 162 F.3d 708, 717 (1st Cir. 1998). "On the other hand," observed the court, Cable's IPO Journal article demonstrated the ease with which he was able "to make unqualified assertions concerning the lack of any meaningful negotiation in arriving at underwriting fees." Id.

Although Cable is a non-party, this Court concluded that the antitrust plaintiffs ought be permitted to inquire as to what, if

25

any actions of the defendants contributed to his assertion that underwriting fees are fixed at 7% and non-negotiable. Such a line of inquiry, this Court concluded, would not place an undue burden upon him. Cable would either recall such events or he would not. Nor was requiring Cable to "sort[] through whether or not" the information sought was privileged unduly burdensome. The information Cable was asked to disclose would either be a client confidence or it would not be. It is not unreasonable to presume that a firm with the resources of Goodwin Procter can readily ascertain the extent of their confidentiality obligations.

Put simply, the burdens testifying would impose on Cable were not of the type Rules 26(c) and 45(c)(3)(A)(iv) were designed to allay. See Fed. R. Civ. P. 45(c)(3)(A)(iv) advisory committee's note ("Illustratively, it might be unduly burdensome to compel an adversary to attend trial as a witness if the adversary is known to have no personal knowledge of matters in dispute, especially so if the adversary would be required to incur substantial travel burdens." (emphasis added)); 9 James Wm. Moore et al., Moore's Federal Practice, § 45.04[3][a] (3d ed. 2005) ("Although quashing a subpoena to produce documents is rather common, quashing a subpoena ad testificandum is very rare, because until the witness is asked specific questions, usually there is nothing on which to base a motion to quash.").

## III. CONCLUSION

Accordingly, on December 16, 2005 this Court posed certain questions to Cable and permitted the antitrust plaintiffs to question him regarding the factual bases for certain of his statements featured in IPO Journal. Under the Court's personal supervision, the whole thing took less than an hour. Because the antitrust plaintiffs were permitted to obtain the testimony sought through the subpoena and because requiring Cable's further cooperation would be unduly burdensome, Cable's Motion to Quash [Doc. No. 9] was ALLOWED.

William A. Young

WILLIAM G. YOUNG
DISTRICT JUDGE

27